**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | CASE NO. 2:19-cr-00106-BLW |
|                 ) | |
|        Plaintiff,    ) | **SENTENCING** |
|                 ) | |
|      vs.          ) | |
|                 ) | |
| REBECCA ANNE EBERLEIN,     ) | |
|                 ) | |
|        Defendant.    ) | |
| _____ ) | |

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE B. LYNN WINMILL**
**TUESDAY, DECEMBER 3, 2019; 9:03 A.M.**
**COEUR D' ALENE, IDAHO**

**FOR THE UNITED STATES OF AMERICA**
     Traci Whelan
     US ATTORNEY'S OFFICE
     6450 N. Mineral Drive, Suite 200
     Coeur d'Alene, ID 83815

**FOR DEFENDANT**
     Nicolas Vernon Vieth
     VIETH LAW OFFICES, CHTD.
     912 E. Sherman Avenue
     Coeur d'Alene, ID 83814

Proceedings recorded by digital recording, transcript
produced by transcription.

_____

**TAMARA I. HOHENLEITNER, CSR 619, CRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO  83724

1                             I N D E X

2                      DECEMBER 3, 2019

3

     Proceedings                                Page

4

5         Recommendations by the Government................  4
         Recommendations by the Defense...................  14
         Statement by the Defendant.......................  18

6         Court's comments and Sentencing..................  19

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2                    December 3, 2019

 3            THE CLERK:  The United States District Court for the

 4     District of Idaho is now in session, the Honorable B. Lynn

 5     Winmill presiding.

 6            THE COURT:  Thank you.  Please be seated.

 7            THE CLERK:  The court will now hear sentencing in

 8     United States of America vs. Rebecca Anne Eberlein, Case

 9     No. 2:19-cr-106.

10            Counsel, beginning with the government, please state

11     your appearance.

12            MS. WHELAN:  Good morning, Your Honor.  Traci Whelan

13     for the United States.

14            MR. VIETH:  Good morning, Judge.  Nick Vieth here for

15     Ms. Eberlein.

16            THE COURT:  Thank you, Counsel.

17            I need just one minute to log in.

18            All right.  Ms. Eberlein entered a plea of guilty to

19     Count 1 of the indictment.  The court ordered a presentence

20     investigation report, which has been provided to court and to

21     counsel.

22            Ms. Eberlein, have you had a chance to review the

23     presentence report?

24            THE DEFENDANT:  Yes, I have.

25            THE COURT:  And, Mr. Vieth, can you confirm that you
```

1      have gone over the report with your client?

2              MR. VIETH:  We have, Judge.

3              THE COURT:  All right.  There were no objections filed

4      to the presentence report.  I'll therefore adopt the presentence

5      report as my own findings in this matter.

6              Counsel, do either of you intend to call witnesses?

7              MS. WHELAN:  No, Your Honor.

8              MR. VIETH:  No, Judge.

9              THE COURT:  All right.  That being the case, we will

10     proceed directly to argument of counsel, starting with the

11     government.  Ms. Whelan.

12             MS. WHELAN:  Thank you, Your Honor.

13             THE COURT:  I should note that the court will grant

14     the government's motion for a one-level downward departure under

15     5K1.1.  I believe that leaves the guideline range at 18 to 24

16     months.

17             MS. WHELAN:  Yes, sir.  It would be an offense level

18     15, criminal history category 1, 18 to 24 months.

19             THE COURT:  Go ahead, Ms. Whelan.

20             MS. WHELAN:  Thank you, Your Honor.

21             Your Honor, this morning I reread the presentence

22     report, as I often do before a sentencing, and I read the

23     letters; and something struck me, and so I decided to go a

24     little bit different way with the sentencing.

25             The repeated refrains seem to be in these letters

1    that:  I know nothing of the crime, but I know Rebecca, and she

2    is a good and decent person, and she is innocent.  Please throw

3    the case out.  She would not have done this.  This is out of the

4    character for her.

5         And I think it is important -- and it is critically

6    important to recognize that today's sentencing is based upon

7    Ms. Eberlein's actions, not upon her character.  Life is not so

8    black and white that we can categorize people as simply moral or

9    immoral, religious or sinners; it is gradient, and good people

10   make poor and sometimes criminal decisions.

11        After today's sentencing, it is critically important

12   to remember that Ms. Eberlein was sentenced because of her

13   criminal conduct, not because of her values or not because of

14   the values she has as a person.  She will remain the devoted

15   aunt and daughter.

16        And it is this court who will determine the punishment

17   today for her actions, but it's Ms. Eberlein herself and her

18   family and friends who are present who will decide how and if

19   they will continue to support her and really whose judgment

20   matters.

21        They are going to influence whether she takes steps to

22   correct -- well, "correct" is not the right word that I want.

23   They are going to make the decisions as to whether she is going

24   to seek to get treatment or whether she is not.  Because that's

25   not in line with who they know she is.  They are going to

1    make -- help her make the decision as to whether modern medicine

2    can or cannot help her or which road to take.

3         And to that end, it is difficult for all of us in this

4    courtroom to reach a conclusion if we don't all have the facts.

5    And what's been replete in the letters is that they don't have

6    the facts and that the facts are going to play into what

7    sentence the court does.

8         And so these are the facts that both Ms. Eberlein, her

9    attorney, and the United States have agreed are true.  And these

10   are critical, because these aren't contained in the PSR, Judge,

11   that you saw.  Okay.  These are facts.

12        Katrina Danforth is a very manipulative woman who made

13   Ms. Eberlein believe that she loved her and that she cared for

14   her.  The defendant supported Katrina Danforth.  They were

15   roommates.  She supported her emotionally and, in large part,

16   financially.

17        And Ms. Eberlein became personally involved in a

18   custody dispute between Ms. Danforth and the father of her

19   child.  And during the course of that, Ms. Danforth caused her

20   to believe certain absolute untruths, such as that the child had

21   been sexually abused by an uncle or that the victim was -- had

22   raped her.  And that's the genesis of this child, and these

23   stories caused her to believe that it was wrong when Danforth

24   lost custody.

25        And because of the personality and the mental health

1    issues that we see in the mental health evaluation, Ms. Eberlein

2    made really bad choices to -- and we can see this in the

3    letters.  Right?  She is the protector; she is the caretaker;

4    she has got everyone's back; she can fix things.  Right?  And so

5    this is the steps that she took.

6            Danforth discussed with Ms. Eberlein Danforth's desire

7    to find someone to murder the father of Danforth's child, and

8    Eberlein took steps to help her find somebody.  Okay.  It was

9    Eberlein who spoke to the man that Ms. Eberlein had been dating

10   and asked if he knew anyone who could help, that Danforth wanted

11   somebody murdered.

12           And when the man said he might know somebody, Eberlein

13   reported this to Danforth, and Danforth directed her:  Well,

14   follow up with that, get more information.  How would I set it

15   up?

16           So then the man she is dating texts her and says:  Can

17   Katrina talk?  And Danforth provides the phone -- excuse

18   me -- Eberlein provides the phone to Danforth, and Danforth

19   wants out of the room, right, to have this conversation.

20   Ms. Eberlein knew what they were talking about; not the

21   specifics, but that it's about murdering somebody.

22           Then, after this, Eberlein met with that same man, and

23   she got the phone number for Danforth, and she provided it to

24   Danforth.  She is the conduit here.

25           When Danforth went to meet with the would-be hit man

1    -- who, thank God, was an undercover police officer -- Eberlein

2    not only allowed Danforth to take her car, but she followed in

3    Danforth's truck to watch and make sure that she was okay.  She

4    is aware that they are meeting with a hit man.

5         When Danforth tells her the meeting went well and she

6    needed to get some pictures together for the hit man, Eberlein

7    watched as Danforth got a collection of photos together and put

8    them in a binder for the hit man.

9         After this, when Danforth wanted to borrow some money,

10   she didn't tell her what for; but Eberlein gave her $2,000.  And

11   it's hard to believe that there is not some connection there in

12   understanding what that money was for, even though it's not

13   expressed.

14        And when Danforth was in Hawaii, she directed Eberlein

15   to text the hit man with just the question:  "ETA?"  And

16   Eberlein did.

17        Never once did Ms. Eberlein notify the police that

18   Danforth was trying to have someone killed.  Never once was

19   there even an anonymous call.  And she knew well who the custody

20   attorney was in all of this, and not even an anonymous call to

21   say:  Hey, you just need to be aware that this is going on.

22        So this idea that she is just being taken advantage of

23   by a highly manipulative woman -- and I'll give you, "highly

24   manipulative" is not correct.  And everyone, as we go forth with

25   this sentencing, needs to be on the same page.

1          Those are the undisputed facts.

2          And there was ample evidence to charge this defendant

3     with murder for hire and not just misprision.  And as this court

4     knows, the directive from the Department of Justice is to charge

5     somebody with the most readily provable offense, which would

6     have been murder for hire.  But there is also an allowance to

7     consider other aggravating factors.

8          Now that we have discussed the accurate facts and they

9     are all out on the table, let's discuss the charging decision

10    and the sentencing.

11         Ms. Eberlein is not the only individual who has been

12    manipulated by Danforth to do immoral or illegal things.

13    Ms. Eberlein made a very good decision early on -- and I know

14    the court referred to an "indictment," but this was actually an

15    information.

16         THE COURT:  Thank you for correcting that.

17         MS. WHELAN:  Thank you, Your Honor.

18         -- in working with Mr. Vieth and getting in front of

19    this as much as she could after what happened.

20         Ms. Eberlein met with law enforcement, and she

21    discussed the fact that there may have been a second hit man out

22    there and helped law enforcement determine that there was not a

23    continued risk at that point to R.H. and his family.

24         Ms. Eberlein -- and in large part, this is through the

25    advocacy of her attorney.

1          And I know somewhere there was a letter that said:

2    "We naively thought that getting a lawyer would help; and

3    instead, it made her show guilt."  That is absolutely not true.

4          THE COURT:  I want to second that notion.  I read that

5    letter as well, and that is clearly mistaken.  Retaining an

6    attorney is never perceived by the court or by anyone in law

7    enforcement or in the prosecutorial world as some kind of

8    admission of guilt.  So I was struck by that.

9          I read the letters as well, just so the record is

10   clear, and the letters of the victims.  I read everything.  One

11   of the reasons we are a few minutes late is I wanted to review

12   Dr. Hanger's psychological evaluation, which I read rather

13   quickly, but I think I was able to certainly understand the

14   substance of that.

15         I just wanted to second, I guess, that observation.

16         MS. WHELAN:  Yes, Your Honor.

17         Because but for the advocacy of her lawyer, the fact

18   that he got the mental health evaluation, the cooperation that

19   at times, I think based upon some things that happened earlier,

20   that he encouraged Ms. Eberlein to do; that's the reason that

21   she is here looking at a guideline range of 18 to 24 months and

22   an offense that only has a three-year statutory maximum rather

23   than murder for hire, which is 120 months, or solicitation for

24   murder, which is 20 years' statutory maximum.  That's the

25   reason.

1    And to that end, I just want to add an aside that

2 Ms. Eberlein has accepted responsibility for her conduct because

3 she knows her conduct, and she has accepted it both in her plea

4 and in the letters she provided to the court.

5    And the worst thing in the world that could happen is

6 if those who were there to support her long after we all leave

7 this courtroom don't accept the facts and accept -- not personal

8 responsibility but accept her acceptance of responsibility;

9 because without that, this woman is not going to be able to go

10 forward.

11    So we look at what an appropriate sentence is for her

12 crime, and it is a crime.  We look to the sentencing

13 guidelines -- which are advisory, as we all know -- which is 18

14 to 24 months, but we also look at the 3553(a) factors as this

15 court fashions an appropriate sentence.

16    Based upon the advisory guidelines, the statutory

17 maximum, and the 3553(a) factors, the United States respectfully

18 submits to this court that probation is not appropriate.

19    Now, Rebecca Eberlein is not an individual who told

20 the hit man that she didn't care who else in the house was

21 murdered as long as it wasn't the little girl, but her actions

22 helped cause that, her conduit in providing the phone number in

23 facilitating this.

24    When we look at the nature and circumstances of the

25 offense, it is hard to imagine a more serious offense than the

1    potential taking of human life except when even that's done even

2    more calculated, such as it could have been in this case, of

3    payment of money.

4            But when we look at the circumstances of this

5    particular offense, which is misprision, right?  And not to

6    group her with the other, but when we look at the misprision,

7    the knowing that somebody is trying to hire somebody to kill

8    another individual and utterly failing in both your religious,

9    your moral, and your legal duties -- and I only bring that up

10   because the letters are replete with conversations about how

11   religion is important here, and Ms. Eberlein and I have had this

12   conversation already -- but in utterly failing to hold up your

13   duty as a citizen, it is a very serious offense.

14           The nature and characteristics of this defendant:

15   Judge, she is a 35-year-old single woman who has an associate's

16   degree, who is a hard worker; by all accounts, has done

17   everything possible for her family and others, who probably

18   leaves very little for herself and her own development because

19   she is so committed to helping others.

20           The need for the sentence imposed to reflect the

21   seriousness of the offense, promote respect for the law, and

22   provide just punishment:  Given what the facts are in this case,

23   to impose a sentence of probation doesn't achieve any of those

24   goals.  The lesser charge certainly took into account many of

25   these aspects of the mental health issues and things like that

1    that exist.

2         To afford adequate deterrence to future criminal

3    conduct, both of this defendant and others:  I am concerned -- I

4    am greatly concerned -- the United States -- excuse me -- is

5    greatly concerned as we read this letter from Ms. Danforth --

6    excuse me -- Ms. Eberlein.

7         And as she talks on page 2 -- taking medicine is an

8    entirely personal decision, and I'm not going to say -- I'm not

9    going to talk about.  But the idea that she doesn't need

10   counseling, that counseling would hold no benefit, that's very

11   concerning about an individual who clearly has mental health

12   issues that contributed to her making these many decisions that

13   are outside of her character.

14        And to say, "I don't need it," or "It's not needed in

15   this case," and to have that supported by family and friends who

16   say, "No, no, she doesn't need counseling," that creates a

17   risk -- a future risk for this society if Ms. Eberlein goes

18   uncounseled and unaddressing her mental health issues.

19        Also, when we look at deterrence for other

20   individuals, other individuals who would engage in this same

21   conduct, to think that probation would be appropriate is -- is

22   not just, and it would not achieve that goal.

23        Judge, there are many, many bad decisions that

24   Ms. Eberlein made that made it possible for the commission of

25   the offense of murder for hire.  There are many good decisions

1    she made, which is coming forward and cooperating, accepting

2    responsibility, meeting with the government twice to discuss not

3    only her own involvement, talking about how Ms. Danforth planned

4    to do things, having the evidence about when she mailed --

5    Ms. Danforth mailing the money.  And there wasn't a sure thing.

6          The evidence against Ms. Danforth is incredibly

7    strong, because there's recordings.  But recordings alone may

8    not have been enough for trial.  So she came in; and through her

9    plea of guilty to misprision, I believe that helped convince

10   Ms. Danforth -- who has not left Ms. Eberlein alone.  She has

11   continued, regardless of the court order, to send this woman

12   cards and letters and photos of herself, even in custody.

13         But the offense of which she is guilty, the failing to

14   notify anybody of the dire situation that could have existed had

15   it not been a hit man, is worthy of a sentence of 18 to 24

16   months with one year supervised release.

17         We would not ask the court to impose a fine because,

18   quite honestly, we would prefer that money to go to counseling,

19   which we are asking the court to order as a condition of

20   supervision.

21         Does the court have any questions?

22         THE COURT:  No.  Thank you very much.

23         MS. WHELAN:  Thank you.

24         THE COURT:  Mr. Vieth.

25         MR. VIETH:  Your Honor, the government gives this

1    phrase -- and I think it's very appropriate -- "committed to

2    helping others and not herself."  You know, I think that kind of

3    summarizes my client.  And, you know, I hate to just put her in

4    that one -- one nutshell or box.

5          But when we first met 11 months ago, 11-1/2 months

6    ago, you know, we sat down and we talked about this situation.

7    We talked about her potential exposure.  We talked about what

8    happened.

9          And I would say over the next 8 months or so, it was a

10   very difficult relationship between us.  It was very

11   contentious.  It was, you know, going over things, going over

12   documents, going over the evidence, going over the potential

13   elements that the government would use for convictions of

14   certain crimes, very meticulous, very -- it was an arduous

15   process.

16         And so then I started to think:  Why is my client

17   fighting me so much, fighting my investigators so much, fighting

18   people that are trying to help her as much as possible?  And

19   that's when we retained the services of Dr. Hanger.

20         I couldn't get my mind around how someone would be

21   willing to literally fall on the sword and take the blame for

22   someone else's actions.  That's not to say that my client has

23   not taken full responsibility for helping and listening and

24   believing and, you know, being this willing, manipulated

25   participant.  She does.  And she understands that and grasps

1    that, and it's taken a long time for me to get there with my

2    client.

3           But I read Dr. Hanger's report, and it's -- it's

4    really sad.  It's -- you know, I'm going through it -- at the

5    beginning, I called over to Ms. Whelan, and we were talking

6    about, you know, grand jury and, you know, what we're going to

7    do about, you know, Ms. Eberlein, and, you know, where the

8    charges are going to go.

9           And I just -- I kept in my mind this notion of, you

10   know, my client has this obsession, this love for this other

11   person that she can't release from.  She cannot -- she was

12   unwilling -- physically, mentally -- to dissect herself from

13   this person that she truly loved.

14          And so that's when I talked to Dr. Hanger, and

15   Dr. Hanger said:  Yes, bring her in.  We will talk to her.  We

16   will figure out what's going on.

17          And, you know, on the outset, Dr. Hanger outlines that

18   my client is incredibly intelligent.  I think she is in the 93rd

19   or 94th percentile IQ.  She is -- you know, and when she does

20   her own research, she does her own research.  You know, "Nick,

21   what about this case?"  "What about this issue?"  "What about

22   this situation?"  "What about this?"  You know, so, I mean, she

23   is incredibly smart.

24          So then I asked:  If you're that smart, how can you be

25   manipulated by someone like this?

1          And I think that is where Dr. Hanger's report really

2     gets to the bones.  And she tells Dr. Hanger, you know, about,

3     you know, her relationship and that she was so scared of Katy

4     leaving her and being rejected, that she would get mad; and she

5     was so obsessed, she gave up everything.

6          And this is a person, as we read in the letters, that

7     has a -- you know, a very high moral compass.  She is dedicated

8     to her church.  She is dedicated to her faith.  She is dedicated

9     to her family and friends.

10          That she says:  I gave up everything -- my sense of

11     morals, financial; everything I was doing was for her without

12     regard for myself.  And.

13          I think that's also reflected in her letter when she

14     says that, you know, when I went to the priest and the priest

15     said, "How are you doing?  You keep talking about your friends,

16     your family, your work, everybody else."  She is the helper for

17     everybody else, but she wasn't looking inside.  She wasn't

18     helping herself.

19          And so I echo Ms. Whelan's concern, and I -- and it's

20     going to, you know, be objected to by my client.  She does not

21     want to have mental health counseling, and she does not want to

22     be directed for medication.  But I -- I think it's important

23     and, you know, just to make sure that she has the ability to

24     know that she needs to help herself first.

25          That's -- that's where we're at, Judge.  And it's

1      taken me a long time, you know.  And she has tried to fire me

2      several times, and I have been able to hang on.  But I -- in my

3      read of everything here, I think that the proper and just way to

4      punish my client is to put her on the longest term of probation

5      possible, five years; to have her give back to this community of

6      500 hours of community service -- that's a couple days a month

7      if I have my math correct -- to have her continue to work in

8      massage and for the person that she is currently under his wing;

9      and go to mental health counseling.

10             And she is a smart, hardworking person, but she needs

11     to know that she cannot be used.  She is a giver.

12             And that's all I have to say, Judge.

13             THE COURT:  Thank you.

14             I pronounce your name "Eberlein" because I know

15     someone whose name is Heberlein, and they -- it's spelled the

16     same way with an H.  Is "Eberlein" correct?

17             THE DEFENDANT:  Yes, it is.

18             THE COURT:  All right.  Ms. Eberlein, anything you

19     would like to say in your own behalf?  You're not required to,

20     but it's your right, and I certainly would love to hear anything

21     you have to say.

22             MR. VIETH:  Do you want us to stand, Judge?

23             THE COURT:  No, no, no.  She can just remain

24     comfortable.

25             THE DEFENDANT:  At this point, I mean, I take people's

1    input and reflect upon, you know, on myself and actually

2    determine what I think of it, what my opinion is of it.

3              I think that, you know, the way that Ms. Whelan

4    presented her opinion on my counseling, I actually -- I would

5    say counseling, yes, it could be helpful with, I suppose,

6    helping myself set boundaries instead of people taking advantage

7    of me.

8              I have admittedly lost a lot of money to helping

9    people that I could have used for myself or saved for

10   retirement.  Counseling I would not be opposed to, and I

11   wouldn't be upset or angry about that.

12             The medications I wouldn't want to take, you know.

13   But, you know, I can't really add anything else really to -- you

14   know, I -- unkindness, you know, you see in at least prison

15   movies and things like that, you know, people are extremely

16   unkind.  That would be so far upsetting to me psychologically

17   speaking.  You know, it would be a serious tragedy.  But, you

18   know, that's completely up to you what you believe would be

19   better.

20             I know you don't know me, so it is hard to fully --

21   fully decide that.  But you have all the facts and the letters;

22   and, you know, I trust whatever you believe is right.

23             THE COURT:  All right.  Thank you.

24             I need to take care of kind of housekeeping matters

25   first, so I hope you'll bear with me.  In federal court, unlike

1    in state court, because of the federal sentencing guidelines, we

2    have to go through kind of a numbers game, and we have done that

3    in part.

4          I don't think, however, I asked the government to move

5    for the third level for acceptance.

6          MS. WHELAN:  We would so move, Your Honor.

7          THE COURT:  All right.  I'll grant that motion.

8          As noted previously, I'll adopt the presentence report

9    as my own findings.  After granting the government's motion for

10   a third level -- excuse me -- for, yeah, a third level for

11   acceptance of responsibility and also an additional level based

12   upon the defendant's cooperation under Section 5K1.1 of the

13   guidelines, that does leave the guideline range at 18 to 24

14   months.

15         But as counsel have noted, the guidelines are now

16   advisory, so the court can impose a sentence above or below the

17   guideline range based upon an overall assessment of the factors

18   in this case.

19         Now, I'm going to take a few minutes, Ms. Eberlein,

20   and go through kind of the statutory direction that I'm given,

21   things I'm to consider.  And then at the end, I'm going to kind

22   of assess on a more subjective basis what I think drives the

23   court's decision in this case.

24         The first is -- the first factor the court is to

25   consider is the nature and circumstances of the offense.  The

charge is one count of misprision of a felony, based upon Ms. Eberlein's conduct in 2018 in helping conceal a crime of use of interstate commerce facilities in the commission of murder for hire.

Now, that's the charge to which Ms. Eberlein has pled guilty and for which she will be sentenced.  But I think Ms. Whelan is correct; I think, based upon the conduct that was described, there is no doubt in my mind you could have been charged with, essentially, on either a conspiracy or aiding and abetting theory with the same crime Ms. Danforth is facing with a 10-year maximum sentence.  So you clearly benefited.

And I'm going to give Mr. Vieth a lot of credit in his representation of you.  Simply persuading the government to go with this lesser offense, he more than earned his pay just in that fact alone, because -- and I have to give Ms. Whelan credit as well.  She's absolutely correct; the Justice Department, under some administrations, issues this memorandum which directs the U.S. Attorney's Office to charge and not accept a plea agreement except to that crime which is -- carries the longest prison sentence which is readily provable.

In this case, that would have been murder for hire, aiding and abetting.  But I think in this case, Ms. Whelan, being an excellent attorney and prosecutor, and Mr. Vieth, being an excellent defense lawyer, used some common sense and realized this case was a little different and required a different

1    approach.

2         The next factor for the court to consider is the

3    history and characteristics of the defendant.  And that's really

4    critical in this case.

5         Ms. Eberlein is a 35-year-old single woman, born and

6    raised in Washington but raised in Post Falls where she -- while

7    she was in high school.  She was homeschooled for part of that,

8    also attended private schools, then attended a private Catholic

9    school where she earned an associate of arts.

10        She, by all accounts, I noted -- it was very

11   interesting; in the psychological evaluation, there is a very

12   disparate kind of IQ in terms of physical ability and mental

13   ability.  I won't say off the charts, but very, very high.  But

14   then when it comes to the personal communications, it drops way

15   down.  And that's a function of some mental health things

16   that -- and I want to address mental health.

17        I get frustrated when people -- you know, they are

18   more than willing if they have got a broken arm or a chemical

19   imbalance in -- let's say their thyroid isn't working properly.

20   You go to a doctor, and the doctor helps you.

21        Our brain is no different.  We all can -- well, in

22   some ways, our brain is even more of a challenge because it is

23   so complex that, you know, what is the norm?  What is normal?

24   It is really hard to assess.

25        And I've said I think everyone can benefit from

counseling, including myself.  But I'm worried that we have
created this stigma to receiving mental health treatment that
somehow we think that's an indication that we are weak in some
way.

You are no more weak if you need mental health
counseling than you are if you have the flu and need a flu
vaccination or you need a treatment for fever.  It's just a
function of being a human being and having a very complex
physical body and a very complex brain and psyche.

So I just want you to understand that.  That's my
point of view.  And I think it's a view you need to embrace.  I
don't know if it's a result of your upbringing or a concern
because you may have felt that you're always just a little out
of sync with a lot of other people, so that you feel that is a
weakness and you hate to acknowledge that weakness.  We are all
out of sync with everyone else.  It's just part of being a human
being, and we have to address that as best we can.

I would note that that's -- despite a very substantial
intellect, you have worked primarily as a waitress and a
masseuse.  I think there are some other greater opportunities
that, hopefully, you will pursue.

There is no history of substance abuse.  You have been
diagnosed with persistent depressive disorder and, I think most
importantly, a dependent personality disorder.  I'm going to
comment on that more in just a moment.

1       As I noted, there is no prior criminal record.

2       Now, finally, the court is to impose a sentence which

3   is sufficient but not greater than necessary to achieve certain

4   statutory objectives.  Those are set forth in 18 U.S. Code

5   Section 3553(a)(2).  Therefore, the sentence should reflect the

6   seriousness of the offense, promote respect for the law, provide

7   for just punishment, adequate deterrence, protection of the

8   public, and any needed training, care, or correctional

9   treatment.

10      Now, there is a lot of things I want to say.  Let me

11  start with the comments you made just at the close of your

12  comments to the court in which you are concerned that being

13  incarcerated is not going to be good for you; it would be

14  actually horrifying.  And I can't remember the exact terms you

15  used, but would be damaging to you in some way.

16      You know, I understand that, and I -- I get that.  But

17  you need to understand that, as I listed these objectives, they

18  weren't -- most of them were not focused on your needs.  Most of

19  them were focused on society's needs, and that's what has to

20  drive a court in imposing a sentence.

21      If I were simply to choose the sentence which is best

22  for Ms. Eberlein, very clearly, it would be probation and a lot

23  of counseling; but that's not the only thing I need to see.  I

24  need to reflect the seriousness of the offense, make sure people

25  respect the law, make sure that the sentence is just, that it

1    will deter not so much yourself -- I'm not worried about you --

2    but deter others from engaging in this kind of conduct.  And

3    finally, and most importantly, protecting the public.

4         There are victims here.  I read all of their letters,

5    both yesterday in preparing for the, I guess, aborted effort at

6    trying to complete the sentencing for Ms. Danforth.  And you

7    almost cannot describe what it is like to live with an

8    understanding that someone has literally tried to kill you and

9    may still be trying to kill you.  And it just has completely

10   demolished the lives of the victim and his family.

11        So I think that's why, in a case like this, that I'm

12   going to be very upfront:  Probation is just not an option in

13   this case; it just cannot be.  It would just, I think, fly in

14   the face of all of those objectives.  On the other hand, I'm not

15   sure a guideline sentence is necessary, either.

16        So as I balance these factors, this is a very, very

17   serious crime.  And, in fact, I sometimes wonder why there is a

18   10-year maximum sentence on a charge of this sort.  In state

19   court, attempted murder could be much -- could be dealt with

20   much more harshly.

21        In this case, you set in motion events that could have

22   resulted in the death of another human being.  You may well have

23   provided money, knowingly or unknowingly, to Ms. Danforth for

24   the down payment on the murder.  You acted as something of an

25   intermediary.  Importantly, you received a huge benefit because

1    of the plea charge -- the charging decision and the plea

2    agreement that the government agreed to enter into.

3           And finally, as kind of an aggravating factor, I'm

4    very concerned by your lack of a realistic kind of

5    self-perception about the need for counseling and perhaps even

6    medication.

7           I hope you would realize that the actions which you

8    undertake are not the kind of actions that one would expect from

9    someone who is completely sound in terms of their mental health.

10          It is not -- and as I look at the other things about

11   your character, they are just so not in keeping with who you

12   are, that they just say and scream out that there is something

13   wrong here, something going on with you that made you act in

14   this way that was so incredibly abnormal, abnormal for you.

15   It's just not the way -- anything I saw about you and your

16   background.

17          Now, what was that?  I think here -- and, in fact, I

18   was thinking that, in some way, you know, you were like a

19   compass in which, you know, magnetic north is the way your

20   compass normally pulled you, and that typically was a moral

21   life.  And then somehow, Ms. Danforth came into your life with a

22   power of a magnet; and all of a sudden, your compass was totally

23   askew.

24          And so I think that is the mitigating factor in this

25   case which I think justifies a sentence somewhat below the

1       guidelines.

2               I think it is absolutely clear that, but for

3       Ms. Danforth's personality and her ability to manipulate others,

4       coupled with your sensitive mental state which made you

5       particularly susceptible to that kind of influence, I think

6       that's what really led to this abnormal, atypical conduct that

7       I'm sure you would never have engaged in but for that

8       conduct -- that influence from Ms. Danforth.

9               By way of other mitigating factors: your cooperation

10      with the government; your lack of criminal record; and as I

11      noted, that, by all accounts, you have an excellent character

12      and you are fundamentally a very good person.

13              So where does that leave the court?  It leaves me with

14      two competing impulses.  One is, as I noted, probation; the

15      other is a very long prison sentence to reflect the seriousness

16      of the crime committed.  I'm going to try to find the sentence

17      that I think balances all of these factors in an appropriate

18      way, and that sentence will be as follows.

19              If you'll stand, I'll pronounce sentence.

20              The defendant, Rebecca Anne Eberlein, having pled

21      guilty to Count 1 of the indictment, and the court being

22      satisfied that you are guilty as charged, I hereby order and

23      adjudge as follows:

24              Pursuant to the Sentencing Reform Act of 1984, it is

25      the judgment of the court that you be committed to the custody

1      of the Bureau of Prisons for a term of 15 months.

2           It is further ordered that you pay to the

3      United States a special assessment of $100 which will be due

4      immediately.

5           The government -- the probation office recommended a

6      fine of $2,500.  The government has not requested a fine.  I

7      think a fine of $500 would be appropriate, and most of that I

8      think you could pay even while incarcerated.

9           It's -- it's something of a reminder of your conduct,

10     but I think -- actually, let's make it -- actually, on second

11     thought, I think I will not impose a fine.  I think, as

12     Ms. Whelan suggested, paying for counseling is probably more

13     important.  And if you don't -- aren't able to pay for it, the

14     government would pick up the cost during the period of

15     supervised release.

16          So for that reason, I think I'll find that you do not

17     have the ability to pay a fine.  I did look at your financial

18     circumstance from the presentence report and, therefore, will

19     not impose any fine in this matter.

20          After considering your financial resources, I will

21     order payment of the special assessment under the following

22     schedule:

23          Unless modified by the court, while in custody, you

24     will submit nominal payments of not less than $25 per quarter

25     pursuant to the Bureau of Prisons Inmate Financial

1       Responsibility Program.  And during the term of supervised

2       release, you will submit nominal monthly payments of 10 percent

3       of your gross income but not less than $25 per month.

4               Supervised release will be imposed for a period of one

5       year.  And I agree with Mr. Vieth; I wish that could be longer,

6       but that's the statutory maximum.  And that was one of the

7       reasons I contemplated probation, but I think the need for

8       incarceration was greater than the need for more extended period

9       of supervision.  So it will be one year of supervised release to

10      commence upon your release from imprisonment.

11              During that term of supervised release, you will

12      comply with all mandatory, standard, and special terms of

13      supervised release as stated in the sentencing recommendation

14      filed as Docket No. 23 and as will be outlined in the court's

15      written judgment to be filed later in this proceeding.

16              Mr. Vieth, did you have a chance to go over those

17      conditions with your client?

18              MR. VIETH:  We did earlier, yes, Judge.

19              THE COURT:  With the exception of an objection to

20      medication and counseling, which I'm going to impose anyway,

21      were there any other objections?

22              MR. VIETH:  No, Judge.

23              THE COURT:  All right.  Do you have any -- do you have

24      any questions, Ms. Eberlein, about those conditions?

25              THE DEFENDANT:  No.

1          THE COURT:  All right.  Now -- okay.  I'm not going

2     to -- the requirement of counseling is just absolute.  The

3     requirement of medication, that's going to be, I think, clearly

4     more in the discretion of your probation officer.  But if it is

5     recommended by a mental health provider, then I am going to

6     require it.

7          I understand -- you know, if you feel that there is

8     just some religious, moral objection, you can ask your attorney

9     to bring it up, but it has to be resolved by the court.  If your

10    probation officer tells you you must take it, you will take it

11    unless you petition the court and then raise that issue for me

12    to resolve, and then I'll hear any arguments about any religious

13    beliefs you may have that may be contrary to the use of such

14    medication.

15         But in the absence of a determination of the court

16    that your First Amendment rights somehow must prevail, you will

17    be required to take that medication.

18         I just -- I hope what I said at the outset of my

19    statement to you in sentencing expresses my views that you

20    should not take this as some -- something wrong.  It's just like

21    going to the doctor and trying to find help for a problem that

22    you're wrestling with.  And that's the view generally I take,

23    and I hope you will adopt that as well.

24         I will advise you that if you violate the terms of

25    supervised release, you will be brought back before the court

1    and a further sentence of incarceration can be imposed.

2          A defendant has the right to appeal their conviction

3    or -- oh, let me indicate:  I'm going to allow you to

4    voluntarily surrender.  What that means is that you will be

5    required to continue to comply with the conditions of pretrial

6    release.

7          You will need to maintain regular contact with the

8    pretrial services officer with whom you have been working.  They

9    will be advised by the Bureau of Prisons as to the date and

10   location where you are to report.

11         That typically is anywhere from four to eight weeks

12   from now.  My guess is it would be sometime in early January,

13   but I can't control that.

14         If that were to -- I should note that if you fail to

15   comply with the conditions of pretrial release while awaiting

16   your surrender date and location, then you will forfeit that

17   right and be taken into custody immediately.

18         And likewise, if you fail to surrender for service of

19   sentence as I am now ordering, that will be a separate crime for

20   which you will be charged, and the sentence will be consecutive

21   to the sentence I have imposed here.

22         So you will just add time if you don't report as the

23   court is directing you to.

24         Do you have any questions about that?

25         THE DEFENDANT:  No.

1          THE COURT:  All right.  You have the right to appeal

2     the court's decision concerning your conviction and sentence.

3     However, the plea agreement did include a provision which waived

4     those rights, by and large.  But because you may wish to file an

5     appeal to challenge the waiver of your appeal rights or to

6     appeal an issue not waived by the terms of your plea agreement,

7     I will advise you of how to pursue an appeal despite that

8     waiver.

9          To pursue an appeal, you must file a notice of appeal

10    within 14 days after judgment is entered in your case.  If you

11    are unable to pay the cost of an appeal, you may apply for leave

12    to appeal in forma pauperis.  If you so request and qualify, the

13    clerk of the court will arrange for legal representation and

14    will prepare and file a notice of appeal on your behalf.

15         I don't believe there was any forfeiture issues.

16         MS. WHELAN:  No, Your Honor.

17         THE COURT:  All right.  I will recommend to the Bureau

18    of Prisons that you receive credit for all time served in

19    federal custody.  I don't know if there is a recommendation.

20    Dublin, California, is the closest women's facility, but there

21    are facilities in Phoenix, Arizona, and I believe Texas.

22         MR. VIETH:  Does Sea-Tac still have a women's -- I

23    thought they did.

24         THE COURT:  I have no idea.

25         Mr. Wullenwaber, do you know if they did?

1          THE PROBATION OFFICER:  Yes, they are able to

2     house female inmates at Sea-Tac.

3          THE COURT:  I'll recommend Sea-Tac, if you wish.  It's

4     just -- again, I should visit that facility.  I have been to

5     Dublin, and I have been to the Arizona, so I know what's there.

6          I'm a little worried that Sea-Tac may be more of a

7     transitional facility and may not have the programming and

8     counseling.  I'm also not sure you will qualify because I think

9     typically they only hold people there for fairly short

10    sentences.

11         MR. VIETH:  For visitation purposes, Your Honor, I

12    would --

13         THE COURT:  All right.  Well, I'll make the

14    recommendation; and if you don't qualify, you don't qualify.

15         I should note -- and I'm confident, Ms. Eberlein, that

16    you -- well, I guess who knows, but you should qualify for

17    good-time credit, which means you can knock a little over two

18    months off from that sentence unless there are some problems

19    while incarcerated.  So you would probably be looking at closer

20    to a 12-1/2 month sentence unless you have some problem while

21    incarcerated.  I'm just pointing that out.

22         So I'll recommend Sea-Tac as a place of confinement;

23    and if you don't qualify, then I suspect Dublin would be the

24    next best choice.

25         All right.  Mr. Wullenwaber, Ms. Parson, did I

1      overlook anything?

2                  THE PROBATION OFFICER:  Not from me.

3                  THE CLERK:  No, Your Honor.

4                  THE COURT:  Counsel, anything else?

5                  MS. WHELAN:  Yes, Judge.  One is a housekeeping matter

6      only.  And it's entirely possible that I missed it, but I would

7      ask that both the defendant and her attorney affirm on the

8      record that they reviewed the PSR with each other in its

9      entirety.  I didn't get that.

10                 THE COURT:  I'm quite sure -- first thing I asked.  I

11     asked first Ms. Eberlein if she reviewed it; she confirmed that.

12     I asked Mr. Vieth to confirm that he had reviewed it with his

13     client, and he confirmed that he had.

14                 MS. WHELAN:  Excellent.  Then I just missed it because

15     I was preparing.

16                 THE COURT:  That's why I ask.  I don't want to miss

17     anything, either.

18                 MS. WHELAN:  And the other aspect, Judge -- and I

19     forgot this in my recommendation -- is one of the conditions of

20     supervised release that is being asked for is that she be

21     ordered to have no contact with the victims of this case during

22     the term of imprisonment or supervised release.

23                 THE COURT:  I assume that's understood, Ms. Eberlein?

24                 THE DEFENDANT:  For sure.

25                 THE COURT:  All right.

1          MR. VIETH:  Your Honor, my client does have one

2     request.  She was unsure whether or not she would be allowed to

3     have her religious scapular in while she is incarcerated.  I

4     don't know what the rules are, but if there is any way to --

5          THE COURT:  I would be shocked if they would prohibit

6     that, assuming that it's essentially like a crucifix or

7     something like that.

8          THE DEFENDANT:  It's a round scapular.  It's kind of

9     like that.  It's just, basically, whoever is wearing it won't go

10    to hell, is the belief.  So --

11         THE COURT:  Okay.  The only reason it would not be

12    allowed is if it was perceived by the Bureau of Prisons as

13    possibly being used as a weapon, and I can't imagine that being

14    the case.

15         There is not only your First Amendment rights, but I

16    think there is a statute adopted by Congress 15 years ago to

17    protect the rights of those incarcerated to practice their

18    religion.

19         So I can't control that; that would be up to the

20    Bureau of Prisons.  But I think that is -- I would be shocked if

21    they would not allow that.  But if you find that they do not,

22    you should contact your attorney and -- probably in the Western

23    District of Washington, raise that as an issue.

24         But I, frankly, would not be terribly worried about

25    that.  The Bureau of Prisons, I think, is very mindful of the

1    First Amendment right to freedom -- free exercise of religion,

2    and I think that won't be an issue.  But if it is, raise it.

3    All right?

4              Anything else, Mr. Vieth?

5              MR. VIETH:  No, Judge.  Thank you.

6              THE COURT:  All right.  Ms. Eberlein, I wish you the

7    best of luck.  I do want to say I'm -- originally it was planned

8    that Ms. Danforth would have been here for sentencing yesterday.

9    I think it's very helpful for me to have had this sentencing

10   first so that now it gives me a different take on Ms. Danforth.

11   I don't know.  It might have been a tactical error on their part

12   to seek a continuance, but it is what it is.

13             But I do wish you the best of luck.  I'm very

14   confident we won't have an issue going forward, but please

15   understand that if you violate supervised release, I will send

16   you back to prison.  But I would be almost as surprised as you

17   if you were to end up in front of me on a supervised release

18   violation.  And good luck.

19             We will be in recess.

20        (Proceedings concluded at 9:45 a.m.)

21

22

23

24

25

CERTIFICATE OF TRANSCRIPTION

1
2
3
4
5
6          I, Tamara Hohenleitner, do hereby certify that the
7     foregoing was transcribed by me and is a true and correct
8     transcript of the electronically recorded proceedings held in
9     the above-entitled matter.
10
11              Dated this 31st day of January, 2020.
12
13
14              /S/ TAMARA I. HOHENLEITNER
15              _____
                TAMARA I. HOHENLEITNER
16
17
18
19
20
21
22
23
24
25